THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

Case No. 2025CV1323

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

## COMPLAINT

The Northwestern Mutual Life Insurance Company brings this tax refund action against the United States of America, alleging as follows:

## **INTRODUCTION**

1. Section 119(a)(1) of the Internal Revenue Code provides that there "shall be excluded from gross income of an employee the value of any meals … furnished to him … by or on behalf of his employer for the convenience of the employer," so long as "the meals are furnished on the business premises of the employer."

2. Treasury Regulation § 1.119-1(a)(2)(i), in language prevailing since January 1, 1964, advises taxpayers that on-campus meals will satisfy the "convenience of the employer" standard if "furnished for a substantial noncompensatory business reason of the employer."

3. Accordingly, an employer furnishing on-campus meals to its employees for a substantial noncompensatory business reason may invoke Section 119 to exclude the value of those meals from the employees' gross income.

4. As a result of Section 119, rank-and-file employees across the country are protected from the additional tax burden that would otherwise be imposed on the value of those

employer-sponsored meals. Since its enactment in 1954, moreover, Congress has modified Section 119 on multiple occasions, each time expanding (rather than contracting) the scope of this statutory exclusion.

5.     Northwestern Mutual, for its part, has maintained an on-campus cafeteria meal program for the past 110 years, motivated by numerous substantial noncompensatory business reasons.

6.     Despite the sweeping scope of Section 119 and Northwestern Mutual's historic reliance on this statutory exclusion, the IRS now refuses to acknowledge the protections of Section 119 afforded to Northwestern Mutual and its employees.

7.     Accordingly, Northwestern Mutual brings this action for a refund of $23,047,094 in federal income taxes, Federal Insurance Contributions Act taxes, and underpayment interest improperly assessed and collected by the IRS for each calendar quarter for tax years 2014, 2015, 2018 and 2019, and to recover statutory overpayment interest.

8.     Northwestern Mutual is just one of the many targets of a decades-long bureaucratic hostility towards Section 119's plain language broadly excluding from gross income the value of on-campus meals furnished for the "convenience of the employer," conceded by the Treasury Department to encompass meals furnished for *any* "substantial noncompensatory business reason."

9.     While Congress has consistently expanded the scope of the exclusion through multiple amendments to Section 119 over the decades since its enactment, the IRS has repeatedly resisted these Congressional affirmations of the exclusion's broad scope, thwarting the efforts of employers across the country to invoke the protections of Section 119(a)(1).

10.     In 1978, these bureaucratic usurpations became so problematic that Congress was compelled to impose a moratorium on the Treasury Department's enactment of any new regulations seeking to interpret Section 119 out of the Code, which remained in effect for five years.  Institutional memories have faded, however, as the IRS has resumed its systematic thwarting of the sweeping scope of Section 119, burdening thousands of employers and millions of rank-and-file employees across the country with taxes they simply do not owe.

11.     Nor is this overreach attributable to mere administrative error, as the Treasury Department's own regulations enacted over the decades plainly acknowledge Section 119's broad scope.  In 1956, for example, the Treasury Department correctly conveyed in Treas. Reg. § 1.119-1(a)(2) that Section 119 creates a presumption that on-campus meals furnished to employees during the workday will satisfy the "convenience of the employer" standard.

12.     In 1964, the Treasury Department amended Treas. Reg. § 1.119-1 by removing the presumption and introducing new language that remains in effect today.  This 1964 amendment reaffirmed that on-campus meals will satisfy the "convenience of the employer" standard so long as "such meals are furnished for a substantial noncompensatory business reason of the employer."  Although the 1964 amendment substituted the regulatory presumption that had been enacted in 1956 with the "substantial noncompensatory business reason" standard set forth in Treas. Reg. § 1.119-1, the 1964 regulatory language is equally sweeping in scope.

13.     As Congressman Barber Conable of New York stated on the House of Representatives floor fourteen years later, Section 119 was drafted and enacted to "reflect the fact that the meals are usually furnished for the employer's convenience and not as additional employee compensation," decrying "effort[s] by the IRS to tamper with current regulations and current practices," contrary to the "superior role of the Congress in establishing federal tax

policy." *Congressional Record*, Vol. 124, H 6119 (June 28, 1978). While the regulatory safe harbor in Treas. Reg. § 1.119-1(a)(2)(i) has remained in effect for the past 61 years, prevailing IRS interpretations and applications of the regulation nonetheless seek to eviscerate Section 119's broad protections.

14.     As then Chief Counsel for the IRS, Mitchell Rogovin, acknowledged in an October 25, 1965 Memorandum addressing a challenge asserted by a corporate taxpayer seeking to preserve its rights under Section 119, Treas. Reg. § 1.119-1 had been "completely rewritten [in July 1964] to liberalize the definition of 'convenience of the employer'" standard.  Despite this action to expand the scope of Section 119, the IRS continued its unauthorized efforts to restrict the scope of its protections.

15.     In a rebuke still resonant sixty years later, Chief Counsel Rogovin pointedly noted in his October 1965 memo that the subject taxpayer had "provided free meals to its employees for over 50 years," and that "during that period the Service [had] never … imposed any Federal income tax liability with respect to such meals."  Northwestern Mutual had been operating its on-campus cafeteria program for *twice* as many decades as that taxpayer before the IRS acted to strip Northwestern Mutual of its statutory rights during the 2014-15 and 2018-19 audits.

16.     Observing that Section 119 had not been modified by Congress to justify the IRS's interpretation and application of the exclusion, Chief Counsel Rogovin admonished the IRS that it was "likely that the Service would have some difficulty in winning" a court challenge, and encouraged his client to resolve the dispute rather than being "forced into litigation." *See* G.C.M. 33109 (Oct. 25, 1965). Once again, however, institutional memories of this admonition apparently have faded.

4

17. Code Section 119, Treasury Regulation § 1.119-1, and the multiple, substantial noncompensatory business reasons prompting Northwestern Mutual to operate its on-campus cafeterias over the past 110 years compel the conclusion that Northwestern Mutual and its employees are entitled to invoke Section 119.

18. Northwestern Mutual is challenging IRS assessments for the 2014-15 and 2018-19 tax years. However, the core business reasons and objectives driving the company's decision to maintain an on-campus cafeteria meal program for its employees have not changed since Northwestern Mutual served its first free lunches to its employees in January 1915. Each of the noncompensatory business reasons recited in this complaint justifying the invocation of Section 119 applies with equal force to this day.

## PARTIES

19. Plaintiff, The Northwestern Mutual Life Insurance Company, is a Wisconsin mutual insurance corporation with its principal place of business at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

20. Defendant, the United States of America, is named pursuant to 26 U.S.C. § 7422(f)(1). The actions challenged in this lawsuit were undertaken by the United States, acting through its officials and agencies, including through the actions of the IRS and its representatives.

## JURISDICTION

21. Jurisdiction is conferred upon this Court based on 28 U.S.C. § 1346(a)(1), as this is a civil action against the United States for the recovery of an internal revenue tax that was erroneously assessed and collected, and based on 26 U.S.C. § 7422, because Northwestern Mutual timely filed refund claims with the IRS prior to the filing of this action, and because Northwestern Mutual timely filed this lawsuit within two years of the notices of disallowance.

5

22.     Venue lies in this District pursuant to 28 U.S.C. § 1402, which authorizes a corporation asserting a refund claim under 28 U.S.C. § 1346(a)(1) to prosecute its action in the judicial district where the corporation's principal place of business or principal office is located.

## SATISFACTION OF PRE-SUIT REQUIREMENTS

23.     As detailed in the ensuing paragraphs of this Complaint, *infra*, ¶¶ 116-173, Northwestern Mutual has satisfied the statutory requirements for filing this action mandated by 26 U.S.C. § 6532, 26 U.S.C. § 7422, and 28 U.S.C. § 1346(a)(1).

24.     Northwestern Mutual timely filed its Form 941 for each quarter of 2014, 2015, 2018, and 2019. After receipt of Forms 2504-S, 4666, and 4668 reflecting assessments of additional taxes for each of those years, Northwestern Mutual timely paid to the IRS the disputed taxes assessed for each quarter of 2014, 2015, 2018, and 2019.

25.     Northwestern Mutual timely filed a claim for a refund of the disputed taxes on Form 941-X for each quarter of 2014, 2015, 2018, and 2019.

26.     Northwestern Mutual received notices of disallowance from the IRS for each quarter of 2014, 2015, 2018, and 2019.

27.     Northwestern Mutual timely paid to the IRS underpayment interest assessed for each quarter of 2014 and 2015.

28.     Northwestern Mutual timely filed its claim for a refund of underpayment interest on Form 843.

29.     Northwestern Mutual received a notice of disallowance from the IRS denying the entire amount of claimed interest, although the notice erroneously refers only to tax year 2014.

## FACTUAL ALLEGATIONS

30.     Northwestern Mutual is a Wisconsin mutual insurance corporation engaged, directly and through its subsidiaries, in issuing life, disability, and long-term care insurance

6

policies and annuity contracts, and providing a variety of investment and financial services through affiliated entities.

31.     Northwestern Mutual operates in all 50 states and the District of Columbia.  Since 1859, Northwestern Mutual's business has been headquartered in downtown Milwaukee, Wisconsin.

### IRS Historic Treatment of Northwestern Mutual's 110-Year-Old Campus Cafeteria Lunch Program

32.     In furtherance of a variety of practical business reasons, needs and objectives, Northwestern Mutual has provided lunch at no cost to its employees through on-site cafeterias maintained at its corporate headquarters for the past 110 years, beginning in January 1915 and continuing to the present day.

33.     Over time, Northwestern Mutual has expanded its Wisconsin corporate facilities through substantial developments of its downtown Milwaukee campus and through the development of a suburban campus in Franklin, Wisconsin.

34.     Northwestern Mutual has excluded the value of its on-campus meals from its employees' income since the program's inception, and the IRS has considered and acquiesced to this tax treatment over the decades, on numerous occasions, during the course of its perennial examinations of Northwestern Mutual. During the vast majority of these examinations, the IRS did not even question Northwestern Mutual's historic tax treatment of its on-campus meals.

35.     In 1948, the IRS issued a ruling concluding that the value of Northwestern Mutual's on-campus meals was excludable from gross income because those meals were provided for the convenience of Northwestern Mutual as an employer, *i.e.,* because the on-campus meals had been furnished for substantial noncompensatory business reasons.

Northwestern Mutual's multiple, "substantial noncompensatory business reason[s]" for furnishing those on-campus meals to its employees in 1948 continue to this day.

36.     In 1991, the IRS revoked its prior ruling on narrow grounds inapplicable to this dispute, asserting that Northwestern Mutual had not established that "substantially all" of its employees were restricted to a shortened lunch period (based on an erroneous IRS interpretation of Section 119 that was soon to be repudiated by Congress). Moreover, the IRS noted that its ruling did "not preclude application of the exclusion to [Northwestern Mutual's other] employees," consistent with the variety of substantial noncompensatory business reasons justifying Northwestern Mutual's invocation of Section 119.

37.     During its 1991 and 1992 tax year examinations of the company, the IRS initially concluded that Northwestern Mutual owed additional withholding taxes based on the value of the on-campus meals. However, the IRS never tested its assertion in court. Instead, when Northwestern Mutual objected to the proposed assessments, the company reached a favorable resolution of its dispute with the IRS in 1998, including the IRS concession that the vast majority of the disputed taxes were not owed by Northwestern Mutual.  The same considerations, objectives, and substantial noncompensatory business reasons compelling this IRS concession in 1998 continue to compel Northwestern Mutual to operate its on-campus cafeteria meal program to this day.

38.     Northwestern Mutual continued to invoke Section 119 for its on-campus meals over the ensuing years, without drawing any comment or objection from the IRS, despite the perennial audit examinations of Northwestern Mutual conducted by the IRS over those years.

39.     Specifically, the IRS conducted these examinations for 14 of the 15 ensuing tax years after the 1998 favorable resolution of the 1991-1992 challenge, scrutinizing Northwestern

Mutual's returns for the 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2013 tax years. Northwestern Mutual continued invoking the Section 119(a)(1) exclusion for the value of the on-campus meals during each of those 14 tax years. However, the IRS never sought to impose any additional taxes upon Northwestern Mutual for any of those tax years.

40. Nonetheless, despite the absence of any material changes to the facts and circumstances justifying Northwestern Mutual's historic invocation of Section 119(a)(1), the IRS has challenged the company's invocation of Section 119 for the 2014-15 and 2018-19 tax years. When confronted with Northwestern Mutual's refund claims for those years, moreover, the IRS put forward inconsistent and erroneous justifications for disallowing those claims.

**Operation of Northwestern Mutual's
On-Campus Lunch Program
During The Tax Years at Issue**

41. During the 2014, 2015, 2018, and 2019 tax years, Northwestern Mutual's employees reported for work at two corporate campuses in southeastern Wisconsin, including (1) the company's downtown Milwaukee campus located on the eastern fringe of the city, bounded on the east by Lake Michigan; and (2) the company's suburban Franklin campus.

42. During each of these tax years, on-campus meals were provided free of charge to Northwestern Mutual's regular full-time and part-time employees; interns; members of Northwestern Mutual's independent contractor sales force visiting the home office for training or field committee meetings; other contractors and short-term employees whose contracts stipulate lunch is to be provided; and qualified business guests approved by management.

43. Northwestern Mutual's cafeteria meal program policy prohibited certain categories of Northwestern Mutual invitees from participating in the on-campus free lunch program, such as family members and friends of Northwestern Mutual employees; retired

9

Northwestern Mutual employees and family members; contract workers whose agreements did not provide for lunch or who worked outside normal business hours; and members of Northwestern Mutual's independent contractor sales force visiting the company's headquarters for reasons other than training or field committee meetings.

44.     Northwestern Mutual's written lunch policy also limited its non-management employees to a 35-minute lunch period, including, for example, office staff and restaurant and building services employees.

45.     Further, most of the company's non-management employees were subject to a collective bargaining agreement between Northwestern Mutual and the Office and Professional Employees International Union Local 35 (then Union Local 9, after a January 2019 union merger), calling for a 35-minute lunch period for all union-eligible employees.

46.     While Northwestern Mutual did not impose a specific limit on the time that management employees could spend taking lunch, these employees were required to use their judgment and to manage their time appropriately, consistent with the prevailing practices of employers and their management personnel throughout the country.

47.     During all times material to this action, Northwestern Mutual required its management to enforce the company's lunch policies and the company had reasonable measures in place intended to ensure such compliance.

**Northwestern Mutual's Milwaukee Business Premises**

48.     During the 2014, 2015, 2018, and 2019 tax years, a range of about 2,700 to 3,200 employees was employed at Northwestern Mutual's downtown Milwaukee campus, based on end-of-calendar-year numbers, including about 2,700 employees in 2014; 3,100 in 2015; and 3,200 in 2018 and 2019.

49.     In 2014 and 2015, approximately 20% of Northwestern Mutual employees at the Milwaukee downtown campus were non-management employees subject to the 35-minute lunch period limitation.

50.     In 2018 and 2019, respectively, approximately 8% and 14% of Northwestern Mutual Milwaukee campus employees were subject to the 35-minute lunch period limitation as non-management employees.

51.     In 2014, Northwestern Mutual's Milwaukee campus was comprised of four buildings: the North building (818 E. Mason Street), the South building (720 E. Wisconsin Avenue), the Van Buren building (733 N. Van Buren Street), and the West building (611 East Wisconsin Avenue).

52.     In 2015, the Milwaukee campus was expanded through the addition of leased space in the 411 building (411 E. Wisconsin Avenue) for a number of months that year.

53.     In 2017, Northwestern Mutual expanded its Milwaukee campus through the construction of the 32-story "Tower and Commons," where the majority of Northwestern Mutual's employees reported for work during the 2018-2019 tax years.

54.     In 2018, following the opening of the Tower and Commons, Northwestern Mutual vacated the West Building, which later was sold to a third party.

55.     During the 2014 and 2015 tax years, Northwestern Mutual operated four cafeterias on its Milwaukee campus, including the North Building Cafeteria; the South Building – East Cafeteria; the South Building – West Cafeteria; and the West Building Cafeteria.

56.     During the 2018 and 2019 tax years, Northwestern Mutual operated two cafeterias on its Milwaukee campus in the Tower and Commons, including the Second-Floor Cafeteria and the Third-Floor Cafeteria.

57.     The lunch hours for these on-campus cafeterias were as follows:

| Eating Facility | Lunch Hours |
|---|---|
| North Building Cafeteria | 10:45 a.m. – 1:30 p.m. |
| South Building – East Cafeteria | 10:45 a.m. – 1:00 p.m. |
| South Building – West Cafeteria | 10:45 a.m. – 1:30 p.m. |
| West Building Cafeteria | 11:00 a.m. – 1:30 p.m. |
| Tower and Commons Cafeterias | 10:45 a.m. – 1:30 p.m. |

58.     Consistent with the practices of employees throughout the United States, and as required by labor laws recognizing employees' right to take their lunch breaks at traditionally accepted times during the workday, a substantial majority of Northwestern Mutual's employees take their lunch at the on-campus cafeterias between 11:30 a.m. and 12:30 p.m.

59.     Northwestern Mutual maintains records reflecting the estimated number of meals served each day at its Wisconsin corporate campuses, based on a daily count of the number of trays used by cafeteria lunch patrons to ensure sufficient staffing, support, food, and other supplies needed for its cafeteria operations.

60.     The average number of daily meals served at Milwaukee's downtown campus during the 2014-2015 and 2018-2019 tax years ranged from approximately 2,200 to 2,500, and the number of daily meals served in the Milwaukee cafeterias reached as high as 3,100.

**Northwestern Mutual's Franklin Business Premises**

61.     Northwestern Mutual's suburban Franklin campus, located at 1 Northwestern Mutual Way, opened in 2004 and was expanded in 2008 with the addition of a second building.

62.     During the 2014, 2015, 2018, and 2019 tax years, a range of approximately 2,100 to 2,400 employees was employed at Northwestern Mutual's Franklin campus, based on end-of-calendar-year numbers, including about 2,400 employees in 2014 and 2015; 2,100 employees in 2018; and 2,300 employees in 2019.

63. During each of the calendar quarters at issue, approximately 31-33% of Northwestern Mutual's employees at the Franklin campus were non-management employees subject to the 35-minute lunch period limitation.

64. Northwestern Mutual operated an on-site cafeteria on the ground floor of its Franklin campus facilities. While the peak lunch hour in Franklin, as in Milwaukee, was 11:30 a.m. to 12:30 p.m., the Franklin cafeteria was open between 11:00 a.m. and 1:30 p.m.

65. The average number of daily meals served at the Franklin campus during the 2014-2015 and 2018-2019 years ranged from approximately 1,600 to 2,000 meals, and the number of daily meals served in the Franklin cafeterias reached as high as 2,600.

**Insufficient "Eating Facilities" to Secure "Proper Meals"**
**in the Vicinity of Northwestern Mutual's Business Premises**

66. Treasury Regulation § 1.119-1(a)(2)(ii)*(c)* recites, among several examples of qualifying "substantial noncompensatory business reason[s]," meals furnished "to the employee during his working hours because the employee could not otherwise secure proper meals within a reasonable meal period… [such as] when there are insufficient eating facilities in the vicinity of the employer's premises."

67. There are relatively few restaurants in the vicinity of Northwestern Mutual's downtown Milwaukee campus, which is situated on the edge of downtown, constrained on the east by Lake Michigan. Northwestern Mutual's Franklin campus is even more isolated, as there are no public restaurants in the vicinity of campus. Instead, Franklin-based employees would have to leave the vicinity of campus entirely, traveling either by car, bus, or ride-sharing services in order to reach the nearest public restaurant.

68. Even if the 2,200 to 2,500 employees seeking lunch in the vicinity of the Milwaukee campus and the 1,600 to 2,000 employees in Franklin could have collaborated in

13

advance to ensure they all streamed into the area restaurants in an even, efficient distribution to fill the open seats, there are not enough open seats in the neighborhood restaurants to accommodate these thousands of additional lunch patrons.

69.     During the 2014-15 and 2018-19 tax years, the total available seating capacity for additional lunch patrons at restaurants located in the vicinity of the Milwaukee campus, and located even within a 3-mile driving radius of the Franklin campus, was insufficient to accommodate the thousands of Northwestern Mutual employees seeking lunch during those tax years. Even assuming a perfect, 100% efficient distribution of the thousands of Northwestern Mutual employees trying to find a place to eat at these restaurants, there were not enough available seats.

70.     Such a 100% distribution efficiency, of course, is not realistic.  Northwestern Mutual employees are individuals who make their own, independent decisions where to seek lunch each day – nothing akin to marbles rolling randomly over a game board to fill concave recesses in the surface.  When a realistic distribution efficiency is assumed, the realistic shortfall of available seats is even greater.

71.     Nor is there enough time for the Milwaukee campus employees to leave their offices and workstations; exit the sprawling campus buildings; walk to the restaurants; and order, receive, eat their meals, and return to work, all within a reasonable lunch period.

72.     Finally, the scarcity of restaurants in the vicinity of Northwestern Mutual's two corporate campuses is an even bigger obstacle when considering the peak number of lunches served during the four tax years at issue – as many as 3,100 and 2,600 meals served at the Milwaukee and Franklin on-campus cafeterias, respectively.  Northwestern Mutual must decide

whether to operate an on-campus cafeteria program based on the maximum number of employees who may need to secure meals on a given day – not the statistical average.

73.     The dearth of restaurants in the vicinity of Northwestern Mutual's two corporate campuses (a total absence of public restaurants in the vicinity of the Franklin campus) is just one of Northwestern Mutual's many substantial noncompensatory business reasons for furnishing these on-campus meals to its employees.

### Employees Who Were Limited to a "Short" Meal Period

74.     The Treasury Regulations provide that if a category of employees is required to take shorter lunch breaks than the "reasonable meal period" contemplated by Treas. Reg. § 1.119-1(a)(2)(ii)*(c)*, those meals will be considered to have been furnished for a "substantial noncompensatory business reason."

75.     Specifically, Treas. Reg. § 1.119-1(a)(2)(ii)*(b)* provides that meals qualify if they are "furnished to the employee during his working hours because the employer's business is such that the employee must be restricted to a short meal period, such as 30 or 45 minutes, and because the employee could not be expected to eat elsewhere in such a short meal period."

76.     Northwestern Mutual does not concede the Treasury Department's definition of a "short meal period" as "30 or 45 minutes." However, even applying the Treasury Department's unsupported supposition that a 30 to 45-minute lunch is a "short meal period," this regulatory safe-harbor encompassed a significant number of Northwestern Mutual employees during the four subject tax years.

77.     During those tax years, thousands of Northwestern Mutual's employees were subject to a collective bargaining agreement struck with the Office and Professional Employees

International Union Local 35 (Local 9 after the January 2019 merger), contractually limiting these employees to a 30-minute unpaid lunch period, plus 5 minutes of paid travel time.

78.     This time limit made it impossible for those employees to find proper meals at the public restaurants located within the vicinity of the two campuses, other than the handful of employees who could have obtained meals at the few fast-food restaurants within walking distance of the Milwaukee campus.

79.     There are additional categories of non-union employees whose jobs required them to limit their lunches to 35 minutes, such as employees answering time-sensitive calls from investment clients throughout the country who need to place securities trades, among other categories of employees.  None of these categories of employees could have secured proper meals within the limited time available to them from restaurants located in the vicinity of campus.

80.     While there are not enough restaurants in the vicinity of Northwestern Mutual's two Wisconsin corporate campuses to meet the lunch needs of its employees even if all of Northwestern Mutual's employees took 60-minute lunches, the problem is more acute for those limited by contract or by necessity to a 35-minute lunch period.

**Potential Bag Lunches and Meal Delivery Services
Do Not Negate the Right to Invoke the Section 119 Exclusion**

81.     Consistent with Section 119's expansive language and the express provisions of the Treasury Regulations, the IRS acknowledges that the ability to "bring[] food from home" is irrelevant in assessing whether "an employee 'could not otherwise secure proper meals within a reasonable meal period' under § 1.119-1(a)(2)(ii)*(c)*."  *See* I.R.S. Tech. Adv. Mem. 201903017 (Feb. 15, 2019).

82.     Bag lunches are not "eating facilities," nor is an employer required to relegate its employees to daily bag lunches. In fact, federal labor regulations dictate that lunches eaten by employees while at their desks do not even qualify as "*bona fide* meal periods." *See* 25 C.F.R. § 785.19(a).

83.     Potential meal delivery services are equally irrelevant, as the Treasury Regulation refers to "*eating* facilities," rather than "*meal delivery* facilities," or "*meal preparation and pick-up* facilities." Nor can any meaningful number of employees depend upon daily meals delivered to Northwestern Mutual's corporate campuses, because each meal would have had to pass through the company's security portals, causing congestion and delays that preclude meal delivery service as a viable solution. Nor is there enough parking to accommodate a hypothetical stream of meal delivery service vehicles arriving on campus to drop off meals for the company's Milwaukee and Franklin employees.

84.     Employees working a full workday are entitled to a reasonable amount of time to sit down and eat a "proper" meal during their lunch breaks . Section 119 – when properly interpreted and applied – does not begrudge employees this opportunity on pain of being saddled with additional taxes.

### Northwestern Mutual Has Additional "Substantial Noncompensatory Business Reasons" For Its On-Campus Cafeteria Lunch Program

85.     Section 119(a)(1) excludes from employees' taxable income all on-campus meals furnished for the "convenience of the employer," and Treas. Reg. § 1.119-1(a)(2)(i) confirms that meals furnished for any "substantial noncompensatory business reason" qualify for the Section 119 exclusion.

86.     Separate and apart from the necessity of providing on-campus lunches due to the insufficient number of restaurants in the vicinity of the two corporate campuses, Northwestern

Mutual's cafeteria lunch program is maintained for several additional "substantial noncompensatory business reasons" that are not unique to Northwestern Mutual.

87.     Common sense dictates why many prudent employers such as Northwestern Mutual furnish on-campus meals to their employees, driven by multiple substantial noncompensatory business reasons.  You don't need a Wharton School MBA to understand the substantial benefits conferred on employers who furnish on-campus cafeteria meals to their employees. Access to healthy meals results in healthier, more productive employees who miss fewer workdays, yielding corresponding savings in health insurance costs (particularly for self-insured employers such as Northwestern Mutual). Further, the efficiencies gained by employees securing their meals on campus, and the professional development opportunities during those on-campus meals among colleagues, are equally self-evident. The benefits of preserving client confidences within the insurance and financial services industry are likewise apparent.

88.     As previously noted, the Treasury Department initially informed taxpayers in a published regulation that Section 119 creates a presumption that employer-sponsored meals furnished to employees during their workday will qualify for the Section 119 exclusion. Although that 1956 version of the regulation was modified in 1964, the new operative language in Treas. Reg. § 1.119-1(a)(2)(i), still in force today, assures taxpayers that on-campus meals furnished for *any* "substantial noncompensatory business reason" qualifies for the Section 119 exclusion.

89.     Northwestern Mutual is just one of thousands of employers across the country who operate on-campus cafeterias for their employees, driven by many of the same substantial noncompensatory business reasons.  While Section 119 does not compel employers to provide

these lunches to their employees free-of-charge, when an employer chooses to do so, the value of those meals is excluded from its employees' gross income.

### Promoting Employee and Business Development

90.     Northwestern Mutual's employees are able to conveniently schedule and attend lunches with their colleagues, senior leaders, and executives, resulting in ongoing mentorship; enhancing cross-pollination between and among employees; providing a forum for critical exchanges of information and perspectives; enhancing awareness of co-workers' and colleagues' roles in achieving company objectives; providing a vehicle for people managers to identify and promote talented employees throughout the organization; and fostering personal, professional, and business development.

91.     There is substantial literature confirming the enormous benefits conferred upon businesses by the daily employee interactions fostered and facilitated by employer-sponsored on-campus meal programs such as Northwestern Mutual's cafeteria lunch program.

92.     While Northwestern Mutual recruits and hires externally to meet some of its needs, the company historically has relied heavily upon the development of its existing employee workforce to assume leadership roles and management responsibilities.

93.     The majority of Northwestern Mutual's senior leadership teams over the years, for example, has worked in numerous, disparate business units throughout the company, developing the broader perspective, experience, knowledge, and skills that must be possessed by successful senior leaders.

94.     Further, Northwestern Mutual's cafeterias are filled with longstanding lunch groups that meet regularly, often consisting of employees from different departments.  Other lunch groups consist of employees who work in the same department, but perform different functions.  Further, hundreds of scheduled and impromptu lunch meetings between Northwestern

Mutual's employees occur on a daily basis. The substantial business benefits bestowed upon Northwestern Mutual as a result of these daily interactions are inestimable.

95.     One would be hard-pressed to find any Northwestern Mutual employee whose professional development and employment experience has not been enriched by their daily interactions with colleagues during these cafeteria lunch gatherings and discussions.  In each instance, these on-campus cafeteria lunch meetings generate insights and foster employee development that is invaluable to Northwestern Mutual's success.

96.     Northwestern Mutual further capitalizes on these benefits by supplying private meeting rooms adjacent to the cafeterias that can accommodate large group business meetings conducted during the lunch periods.  Further, people managers routinely schedule lunch meetings with their team members throughout the year.

97.     The universal accessibility of the company's on-campus cafeterias allows this business development, mentorship, and daily employee interactions to occur to an extent that simply could not be duplicated in public settings. This is yet another substantial noncompensatory business reason why Northwestern Mutual maintained its on-campus cafeteria meal program during the tax years in question, and continuing to this day.

### *Improving Health and Reducing Health Insurance Costs*

98.     Northwestern Mutual's on-campus cafeterias include menu offerings that ensure its employees have access to nutritious and healthy lunch options on a daily basis.  This has been an important consideration at Northwestern Mutual for decades, including during the 2014-15 and 2018-19 tax years.

99.     Providing healthy meal options is an important element of the company's multi-faceted wellness programs, enhancing employee health and productivity, while reducing the company's cost of maintaining its self-insured health care plans for its employees.

100.    Northwestern Mutual's control over the menu offerings and its ability to encourage and directly influence healthy meal choices would not be possible without its on-campus cafeterias. Many of the company's employees regularly take advantage of the healthy meal options on the menu, conferring substantial business benefits upon Northwestern Mutual.

101.    There is substantial literature and multiple statistical studies confirming the significant economic benefits derived from such multi-pronged health and wellness programs. This is yet another substantial noncompensatory business reason why Northwestern Mutual maintained its on-campus cafeteria meal program during the tax years in question, and continuing to this day.

### Improving Productivity and Effectiveness

102.    Even if there were sufficient public restaurant capacity within the vicinity of the company's corporate campuses to supply proper meals to Northwestern Mutual's thousands of employees, the time saved by employees not having to leave the Northwestern Mutual campuses due to the proximity and convenience afforded by the on-campus cafeterias significantly enhances employee efficiency and productivity.

103.    This applies with particular force to the thousands of Northwestern Mutual employees working at the Franklin campus who would have been required to travel by car, bus, or ride-sharing services to get to any of the few public restaurants in Franklin (as there are none in the vicinity of the Franklin campus).

104.    The private lunch meeting rooms used to host larger gatherings of employees conducting business meetings at the cafeterias and the numerous lunch meetings occurring on a daily basis between supervisors and their team members further boost the efficiencies and cost savings for Northwestern Mutual and its operations.

105. Northwestern Mutual's on-campus cafeterias permit much more to be accomplished in far less time. This is yet another substantial noncompensatory business reason why Northwestern Mutual maintained its on-campus cafeteria meal program during the tax years in question, and continuing to this day.

### *Protecting Confidentiality of Stakeholders*

106. Because Northwestern Mutual is in the insurance and financial services industry, its employees are entrusted on a daily basis with confidential personal, medical, and financial information concerning the company's policyowners, insureds, annuitants, beneficiaries, and clients.

107. Northwestern Mutual employees are able to engage in confidential discussions during their on-campus meals that could never be undertaken properly in a public restaurant.

108. Each Northwestern Mutual employee is subject to an express obligation as a condition of employment to protect all such confidences, based not only on company policy, but also by virtue of numerous state and federal privacy laws and regulations. These confidentiality obligations are ingrained in Northwestern Mutual personnel through periodic training and annual pledges to adhere to the company's confidentiality rules.

109. Secure in the knowledge that each employee is bound to secrecy and confidentiality, Northwestern Mutual's employees can engage in confidential business discussions during these on-campus lunch meetings that could never be conducted in public restaurants. This is yet another substantial noncompensatory business reason why Northwestern Mutual maintained its on-campus cafeteria meal program during the tax years in question, and continuing to this day.

110. Treas. Reg. § 1.119-1(a)(2)(i) provides that "if the employer furnishes meals to his employee for a substantial noncompensatory business reason, the meals so furnished will be

regarded as furnished for the convenience of the employer, even though such meals are also furnished for a compensatory reason." Northwestern Mutual has multiple substantial noncompensatory business reasons for furnishing these on-campus meals, and any one of those reasons provides independent, sufficient grounds to invoke the Section 119 exclusion.

111.    Accordingly, for each of the reasons enumerated in this Complaint, Northwestern Mutual properly invoked the Section 119 exclusion for the value of the on-campus meals furnished to its employees based on the safe-harbor provisions promulgated by the IRS.

### The Subject Meals Were Served
### on Northwestern Mutual's Business Premises

112.    All of the meals placed at issue in this action were served on Northwestern Mutual's Wisconsin corporate campuses.

113.    Because the meals were served on Northwestern Mutual's business premises, Northwestern Mutual satisfies the "business premises" requirement of Section 119(a)(1) of the Code.

### Section 119(b)(4) Threshold Satisfied

114.    More than 50% of the meals Northwestern Mutual furnished to its employees were provided for the convenience of Northwestern Mutual and thus all such meals are excludable from income under Section 119(b)(4).

115.    Indeed, *all* of the meals at issue in this action were furnished for the convenience of Northwestern Mutual, for substantial noncompensatory business reasons, rather than for the purpose of advancing employee recruiting, retention, or compensation.

## Examination Proceedings Giving Rise to the Refund Claims

116.     Northwestern Mutual timely filed a Form 941, *Employer's Quarterly Federal Tax Return*, for each of the calendar quarters placed at issue in this action, for tax years 2014, 2015, 2018 and 2019.

## 2014-2015 Tax Years

117.     After conducting an employment tax examination of Northwestern Mutual for the tax years 2014 and 2015, on or about July 30, 2018, the IRS issued a Notice of Proposed Adjustment to Northwestern Mutual, increasing Northwestern Mutual's income and FICA tax liability by $6,355,343 for the tax year ending December 31, 2014 and by $7,180,060 for the tax year ending December 31, 2015.

118.     On or about February 14, 2019, the IRS sent Northwestern Mutual a 30-day letter enclosing an examination report and Forms 2504-S, 4666, and 4668, asserting a proposed assessment of $6,355,343 for the tax year ending December 31, 2014 and $7,180,060 for the tax year ending December 31, 2015.

119.     On or about April 1, 2019, Northwestern Mutual timely submitted a written protest, contesting the full amount of tax shown in the 30-day letter.

120.     On or about May 2, 2019, the IRS issued a rebuttal letter, concluding that its position remained unchanged from the Notice of Proposed Adjustment that had been issued on July 30, 2018.

121.     Northwestern Mutual put forward substantial legal and factual support for its longstanding reliance on the Code Section 119 exclusion in advance of and during a conference with the IRS Independent Office of Appeals held on September 23, 2020.

122.     On or about September 27, 2021, the Office of Appeals rejected Northwestern Mutual's appeal and concluded that the full amount of tax would be assessed. The IRS enclosed

Forms 2504-S, 4666, and 4668, reflecting an assessment of $6,355,343 for the tax year ending December 31, 2014 and $7,180,060 for the tax year ending December 31, 2015.

123.    Northwestern Mutual signed the Form 2504-S on October 14, 2021, agreeing to the assessment of the amounts shown in the forms (subject to its right to assert a refund claim), and the signed Form 2504-S was mailed to the IRS on or about October 14, 2021.

124.    On October 15, 2021, Northwestern Mutual effected electronic fund transfers in payment of the full amount of the tax assessments, and each of the electronic payments settled on October 18, 2021. None of the taxes at issue were withheld from employee wages.

125.    The IRS issued eight Form CP220 notices, each dated October 18, 2021, received by Northwestern Mutual no earlier than October 19, 2021, showing the following tax amounts claimed to be due by the IRS, plus interest through November 1, 2021, for each calendar quarter of 2014 and 2015:

| Quarter | Tax | Interest | Total |
|---|---|---|---|
| 1st Quarter 2014 | $1,588,836.00 | $544,670.99 | $2,133,506.99 |
| 2nd Quarter 2014 | $1,588,835.00 | $528,621.58 | $2,117,456.58 |
| 3rd Quarter 2014 | $1,588,836.00 | $512,633.75 | $2,101,469.75 |
| 4th Quarter 2014 | $1,588,836.00 | $491,901.03 | $2,080,737.03 |
| 1st Quarter 2015 | $1,795,015.00 | $544,022.51 | $2,339,037.51 |
| 2nd Quarter 2015 | $1,795,015.00 | $526,354.02 | $2,321,369.02 |
| 3rd Quarter 2015 | $1,795,015.00 | $508,824.90 | $2,303,839.90 |
| 4th Quarter 2015 | $1,795,015.00 | $489,651.23 | $2,284,666.23 |
| **Totals:** | $13,535,403.00 | $4,146,680.01 | $17,682,083.01 |

126.    As Northwestern Mutual already had paid the full amount of the claimed taxes prior to its receipt of the Form CP220 notices, Northwestern Mutual then paid the claimed interest amounts shown above, plus additional daily interest through November 23, 2021, the date on which such electronic funds transfer payments settled.

127.     For the Fourth Quarter of 2014 and the Fourth Quarter of 2015, Northwestern Mutual's payments for the claimed interest amounts shown above were reduced by offsetting amounts payable to Northwestern Mutual by the IRS. Northwestern Mutual's interest payments, by quarter, are shown below, before reduction of the offsetting amounts that were otherwise payable to Northwestern Mutual:

| Quarter | Interest Paid |
|---|---|
| 1st Quarter 2014 | $544,670.99 |
| 2nd Quarter 2014 | $528,621.58 |
| 3rd Quarter 2014 | $512,633.75 |
| 4th Quarter 2014 | $491,901.03 |
| 1st Quarter 2015 | $544,022.51 |
| 2nd Quarter 2015 | $526,354.02 |
| 3rd Quarter 2015 | $508,824.90 |
| 4th Quarter 2015 | $489,651.23 |
| **Total**: | $4,146,680.01 |

**2018-2019 Tax Years**

128.     After conducting an employment tax examination of Northwestern Mutual for tax years 2018 and 2019, on or about October 7, 2021, the IRS issued a Notice of Proposed Adjustment to Northwestern Mutual, increasing Northwestern Mutual's income and FICA tax liability for the tax years ending December 31, 2018 and December 31, 2019.

129.     On or about January 19, 2022, the IRS sent Northwestern Mutual a 30-day letter, enclosing an examination report, along with Forms 2504-S, 4666, and 4668, asserting a proposed income and FICA tax assessment of $2,885,755 for the tax year ending December 31, 2018 and $2,479,256 for the tax year ending December 31, 2019.

130.     Northwestern Mutual signed the Form 2504-S, attached as **Exhibit A**, agreeing to the assessment of the amounts shown in the forms (subject to its right to assert a refund claim),

and submitted the form to the IRS on February 18, 2022. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action. Northwestern Mutual paid the full amount of the tax assessment on February 14, 2022. None of the taxes at issue were withheld from employee wages.

### Refund Claims (2014-15 and 2018-19 Tax Years)

131.    On October 10, 2023, Northwestern Mutual timely filed claims for income and FICA tax refunds totaling $13,535,403 for the eight quarters in 2014 and 2015, attached as **Exhibits B.1-B.8**.  Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

132.    On October 10, 2023, Northwestern Mutual timely filed a claim for refund totaling $4,146,680 for underpayment interest erroneously assessed by the IRS and paid by Northwestern Mutual for each quarter during 2014 and 2015, attached as **Exhibit C**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

133.    On October 24, 2023, Northwestern Mutual timely filed claims for refunds of income and FICA taxes totaling $5,365,011 for the eight calendar quarters in 2018 and 2019, attached as **Exhibits D.1-D.8**. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

### Denial of 2014 Refund Claims

134.    On November 20, 2023, the IRS issued notices disallowing Northwestern Mutual's refund claims for the First and Second Quarters of 2014, attached as **Exhibits E.1-E.2**. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

27

135.     On November 21, 2023, the IRS issued notices disallowing Northwestern Mutual's refund claims for the Third and Fourth Quarters of 2014, attached as **Exhibits E.3-E.4**. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

136.     The IRS denied Northwestern Mutual's refund claims for 2014 as purportedly untimely, based on its patently erroneous conclusion that the last day to file a timely refund claim for 2014 was April 15, 2018.

137.     The statute of limitations for filing a refund claim set forth in Code Section 6511(a) is the later of (i) three years after the time the return was filed, or (ii) two years after the time the tax was paid.

138.     In fact, the IRS's assertion that the refund claims were untimely is directly contradicted by its own publication enclosed with each of those notices.  *See* **Exhibit F**, Publication 1 (Rev. 9-2017), *Your Rights as a Taxpayer* ("You may file a claim for refund if you think you paid too much tax.  You must generally file the claim within 3 years from the date you filed your original return or 2 years from the date you paid the tax, whichever is later.").

139.     While the 2014 Forms 941 were originally filed in 2014 and 2015, Northwestern Mutual did not pay the taxes assessed for 2014 until October 15, 2021.

140.     Based on this October 15, 2021 payment date, Northwestern Mutual's deadline to file refund claims for the calendar quarters in 2014 was October 15, 2023.

141.     Accordingly, Northwestern Mutual timely filed its refund claims for the four quarters of 2014 within the statutory limitations period – two years from the date the taxes were paid – on October 10, 2023.

142. Northwestern Mutual timely brings this suit for refund within two years of the notice of disallowance of the 2014 refund claims. *See* 26 U.S.C. § 6532.

<b>Denial of 2015 Refund Claims</b>

143. On November 20, 2023, the IRS issued a notice disallowing Northwestern Mutual's refund claims for the First Quarter of 2015, attached as **Exhibit E.5**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

144. On November 21, 2023, the IRS issued notices disallowing Northwestern Mutual's refund claims for the Third and Fourth Quarters of 2015, attached as **Exhibits E.6-E.7**. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

145. On November 22, 2023, the IRS issued a notice disallowing Northwestern Mutual's refund claims for the Second Quarter of 2015, attached as **Exhibit E.8**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

146. The IRS denied Northwestern Mutual's refund claims for 2015 as purportedly untimely based on the patently erroneous conclusion that the last day to file a timely refund claim for 2015 was April 15, 2019.

147. The statute of limitations for filing a refund claim set forth in Code Section 6511(a) is the later of (i) three years after the time the return was filed, or (ii) two years after the time the tax was paid.

148. While the 2015 Forms 941 were originally filed in 2015 and 2016, Northwestern Mutual did not pay the taxes assessed for 2015 until October 15, 2021.

149.    Based on this October 15, 2021 payment date, Northwestern Mutual's deadline to file refund claims for the calendar quarters in 2015 was October 15, 2023.

150.    Accordingly, Northwestern Mutual timely filed its refund claims for the four quarters of 2015 within the statutory limitations period – two years from the date the taxes were paid – on October 10, 2023.

151.    Northwestern Mutual timely brings this suit for refund within two years of the notice of disallowance of the 2015 refund claims. *See* 26 U.S.C. § 6532.

### Denial of 2018 Refund Claims

152.    On November 20, 2023, the IRS issued notices disallowing Northwestern Mutual's refund claims for in the First, Third, and Fourth Quarters of 2018, attached as **Exhibits G.1-G.3**. Northwestern Mutual incorporates by reference the entire contents of these exhibits in further support of its claims for relief in this action.

153.    On June 13, 2025, the IRS issued a notice disallowing Northwestern Mutual's refund claim for the Second Quarter of 2018, attached as **Exhibit G.4**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

154.    The IRS denied Northwestern Mutual's refund claims for the First, Third, and Fourth Quarters of 2018 as purportedly untimely based on the patently erroneous conclusion that the last day to file a timely refund claim for 2018 was April 15, 2022.

155.    The statute of limitations for filing a refund claim set forth in Code Section 6511(a) is the later of (i) three years after the time the return was filed, or (ii) two years after the time the tax was paid.

156.    While the 2018 Forms 941 were originally filed in 2018 and 2019, Northwestern Mutual did not pay the taxes assessed for 2018 until February 14, 2022.

157.     Based on this February 14, 2022 payment date, Northwestern Mutual's deadline to file refund claims for the calendar quarters in 2018 was February 14, 2024.

158.     Accordingly, Northwestern Mutual timely filed its refund claims for the four quarters of 2018 within the statutory limitations period – two years from the date the taxes were paid – on October 24, 2023.

159.     The IRS denied Northwestern Mutual's refund claim for the Second Quarter of 2018 based on the erroneous conclusion that the amounts originally reported or previously corrected for Form 941-X do not match the amounts the IRS has on file for Form 941.

160.     Northwestern Mutual accurately reported the corrected and adjusted amounts on its Form 941-X for the Second Quarter of 2018.

161.     Northwestern Mutual timely brings this suit for refund within two years of the notice of disallowance of the 2018 refund claims. *See* 26 U.S.C. § 6532.

## Denial of 2019 Refund Claims

162.     On November 20, 2023, the IRS issued a notice disallowing Northwestern Mutual's refund claim for the Second Quarter of 2019, attached as **Exhibit G.5**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

163.     On December 18, 2023, the IRS issued a notice disallowing Northwestern Mutual's refund claim for the First Quarter of 2019, attached as **Exhibit G.6**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

164.     On April 17, 2024, the IRS issued a notice disallowing Northwestern Mutual's refund claim for the Third Quarter of 2019, attached as **Exhibit G.7**. Northwestern Mutual

incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

165.    On June 13, 2025, the IRS issued a notice disallowing Northwestern Mutual's refund claim for the Fourth Quarter of 2019, attached as **Exhibit G.8**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action.

166.    The IRS denied Northwestern Mutual's refund claims for the First, Second, and Third Quarters of 2019 as purportedly untimely based on the patently erroneous conclusion that the last day to file a timely refund claim for 2019 was April 15, 2023.

167.    The statute of limitations for filing a refund claim set forth in Code Section 6511(a) is the later of (i) three years after the time the return was filed, or (ii) two years after the time the tax was paid.

168.    While the 2019 Forms 941 were originally filed in 2019 and 2020, Northwestern Mutual did not pay the taxes assessed for 2019 until February 14, 2022.

169.    Based on this February 14, 2022 payment date, Northwestern Mutual's deadline to file refund claims for the quarters of 2019 was February 14, 2024.

170.    Accordingly, Northwestern Mutual timely filed its refund claims for all four quarters in 2019 within the statutory limitations period – two years from the date the taxes were paid – on October 24, 2023.

171.    The IRS denied Northwestern Mutual's refund claim for the Fourth Quarter of 2019 based on the erroneous conclusion that the amounts originally reported or previously corrected for Form 941-X do not match the amounts the IRS has on file for Form 941.

32

172. Northwestern Mutual accurately reported the corrected and adjusted amounts on its Form 941-X for the Fourth Quarter of 2019.

173. Northwestern Mutual timely brings this suit for refund within two years of the notice of disallowance of the 2019 refund claims. *See* 26 U.S.C. § 6532.

<u>COUNT I</u>

**Refund Claim for Income Tax and
FICA Tax Overpayment (2014-15 and 2018-19)**

174. Northwestern Mutual realleges and incorporates by reference ¶¶ 1-173 of this Complaint.

175. Northwestern Mutual timely filed Form 941, *Employer's Quarterly Federal Tax Return*, for each quarter during the 2014-15 and 2018-19 tax years, filing those forms on or around April 30, 2014 (1st Quarter – 2014); July 29, 2014 (2nd Quarter – 2014); October 29, 2014 (3rd Quarter – 2014); February 12, 2015 (4th Quarter – 2014); April 29, 2015 (1st Quarter – 2015); July 28, 2015 (2nd Quarter – 2015); October 27, 2015 (3rd Quarter – 2015); February 1, 2016 (4th Quarter – 2015); April 13, 2018 (1st Quarter – 2018); July 20, 2018 (2nd Quarter – 2018); October 22, 2018 (3rd Quarter – 2018); January 31, 2019 (4th Quarter – 2018); April 29, 2019 (1st Quarter – 2019); July 31, 2019 (2nd Quarter – 2019); October 31, 2019 (3rd Quarter – 2019); and February 5, 2020 (4th Quarter – 2019).

176. On October 15, 2021, Northwestern Mutual timely paid to the IRS the total amounts assessed for each of the eight quarters of tax years 2014-15, and on February 14, 2022, the total amounts assessed and reported in the Form 941 for each of the eight quarters of tax years 2018-19.

177.     Northwestern Mutual timely filed a claim for a refund of the disputed taxes on Form 941-X, filing these refund claims on October 10, 2023 for each of the eight quarters of tax years 2014-15, and on October 24, 2023 for each of the eight quarters of tax years 2018-19.

178.     In response, the IRS issued notices disallowing the refund claims as untimely for all but two of the sixteen refund claims, erroneously asserting that the statute of limitations had expired prior to the filing of those refund claims.

a.   On November 20, 2023, notices of disallowance of claims were issued by the IRS encompassing the refund claims for the 1st and 2nd Quarters of 2014; the 1st Quarter of 2015; the 1st, 3rd and 4th Quarters of 2018; and the 2nd Quarter of 2019.

b.   On November 21, 2023, notices of disallowance of claims were issued by the IRS encompassing the refund claims for the 3rd and 4th Quarters of 2014 and the 3rd and 4th Quarters of 2015.

c.   On November 22, 2023, a notice of disallowance of claim was issued by the IRS encompassing the refund claim for the 2nd Quarter of 2015.

d.   On December 18, 2023, a notice of disallowance of claim was issued by the IRS encompassing the refund claim for the 1st Quarter of 2019.

e.   On April 17, 2024, a notice of disallowance of claim was issued by the IRS encompassing the refund claim for the 3rd Quarter of 2019.

179.     Northwestern Mutual's refund claims should have been allowed for each of the reasons alleged in the preceding paragraphs of this Complaint, and the assertion of the expiration of the statutory limitations period by the IRS does not provide a viable basis for denying this claim.

180.    On June 13, 2025, the IRS issued notices disallowing the refund claims for the 2nd Quarter of 2018 and 4th Quarter of 2019 based on the erroneous conclusion that the amounts reported by Northwestern Mutual do not match the amount "originally reported' on file with the IRS.

181.    Northwestern Mutual accurately reported the corrected amounts on its Form 941-X for the 2nd Quarter of 2018 and 4th Quarter of 2019.

182.    As a result of the IRS's failure to allow the claims for refund for tax years 2014-15 and 2018-19, Northwestern Mutual has overpaid taxes in the total amount of $18,900,414 (exclusive of applicable interest).  Accordingly, Northwestern Mutual is entitled to a tax refund of $18,900,414 (exclusive of applicable interest).

183.    In the alternative, and without conceding its entitlement to a refund of $18,900,414 (exclusive of applicable interest) on the grounds enumerated in the preceding paragraphs of this First Count of the Complaint, Northwestern Mutual is entitled to relief on one or more of the following, alternative grounds:

     a.    Refund Based on Reasonable Belief – *FICA Tax Overpayment*.  Pursuant to IRC § 3121(a)(19), even if it were determined that the Section 119 exclusion did not apply to the disputed meals, Northwestern Mutual nonetheless would still be entitled to a refund of the portion of the $18,900,414 comprised of FICA taxes (exclusive of applicable interest), based on its reasonable belief at the time it furnished the meals that its employees would be able to exclude the value of those meals from their income.

b. <u>Refund Based on Reasonable Belief – *Income Tax Overpayment*</u>. Pursuant to IRC §§ 3401(a)(19), 132(e)(2)(A) and (B), and 119; Treas. Reg. § 31.3401(a)-1(b)(9); and as acknowledged by the IRS in TAM 9841001 (10/9/1998), even if it were determined that the Section 119 exclusion did not apply to the disputed meals, Northwestern Mutual nonetheless still would be entitled to a refund of the portion of the $18,900,414 comprised of income taxes (exclusive of applicable interest), based on its reasonable belief that its employees would be able to exclude the value of the meals from their income.

c. <u>Refund Based on the *Central Illinois* "Speculative and Not Precise" Standard – *FICA Tax and Income Tax Overpayment*</u>. Pursuant to *Central Ill. Pub. Serv. Co. v. U.S.*, 435 U.S. 21 (1978), and subsequent case law applying the Supreme Court's holding in *Central Illinois*, even if it were determined that the Section 119 exclusion did not apply to the disputed meals, Northwestern Mutual nonetheless still would be entitled to a refund of the entire $18,900,414 tax overpayment (exclusive of applicable interest). The regulations and IRS guidance determining whether an employer such as Northwestern Mutual had an obligation to withhold and pay income and FICA taxes for the value of on-campus meals furnished to employees were speculative and imprecise at the time those meals were furnished, and continuing through the present date. As such, Northwestern Mutual's belief that the Section 119 exclusion applied to on-campus meals was reasonable. The IRS has challenged Northwestern Mutual's

invocation of Section 119 on grounds that are contrary to the express language of Section 119, the associated Treasury Regulations, and the purpose and scope of Section 119, including as reflected in the legislative history.

d. <u>Refund for Portion of Meals Excludable</u>.  In the event that some, but not all, of the disputed on-campus meals were deemed to fall outside the scope of the Section 119 exclusion, Northwestern Mutual still would be entitled to a refund of that portion of the $18,900,414 (exclusive of applicable interest) attributable to the value of those meals that are deemed to be excludable under Section 119.

184.    Accordingly, Northwestern Mutual is entitled to a refund of $18,900,414 (exclusive of applicable interest), or the alternative relief demanded in the preceding paragraph of this Complaint, and any other or additional relief deemed appropriate by the Court or the trier of fact, to the full extent permitted by law.

**COUNT II**

**Overpayment of Social Security Taxes**

185.    Northwestern Mutual realleges and incorporates by reference ¶¶ 1-173 of this Complaint.

186.    The disputed amounts (erroneously) assessed by the IRS for the 2018-19 tax year audits took into consideration the amount of wages paid to Northwestern Mutual employees in excess of the Social Security wage base for those tax years.

37

187.    However, the disputed amounts (erroneously) assessed by the IRS for the 2014-15 tax year audits did not account for the $117,000 and $118,500 Social Security wage base for 2014 and 2015, respectively.

188.    In the alternative to the relief requested in the First Count of the Complaint, Northwestern Mutual demands a refund of the Social Security (Old-Age, Survivors, and Disability Insurance) taxes paid for tax years 2014-15 in excess of the applicable wage base for those employees whose wages exceeded the $117,000 or $118,500 limits, respectively.

189.    Accordingly, Northwestern Mutual is entitled to a refund of those taxes, and any other or additional relief deemed appropriate by the Court or the trier of fact, to the full extent permitted by law.

## **COUNT III**

### **Underpayment Interest for Tax Years 2014-15**

190.    Northwestern Mutual realleges and incorporates by reference ¶¶ 1-173 of this Complaint.

191.    On September 27, 2021, the IRS provided Northwestern Mutual with Form 2504-S and Forms 4666 and 4668 with an assessment of $6,355,343 for the tax year ending December 31, 2014 and $7,180,060 for the tax year ending December 31, 2015.

192.    Northwestern Mutual signed the Form 2504-S on October 14, 2021, agreeing to the assessment of the amounts shown on that form (subject to its right to object and appeal), mailing the signed Form 2504-S to the IRS on or about October 14, 2021.

193.    Northwestern Mutual paid the full amount of the tax assessment on October 15, 2021 through electronic funds transfers, and each of the electronic payments settled on October 18, 2021.

194. The IRS then issued eight notices on Form CP220, dated October 18, 2021, received by Northwestern Mutual on or after October 19, 2021, reflecting the following tax amounts due, plus interest through November 1, 2021:

| Quarter | Tax | Interest | Total |
|---|---|---|---|
| 1st Quarter 2014 | $1,588,836.00 | $544,670.99 | $2,133,506.99 |
| 2nd Quarter 2014 | $1,588,835.00 | $528,621.58 | $2,117,456.58 |
| 3rd Quarter 2014 | $1,588,836.00 | $512,633.75 | $2,101,469.75 |
| 4th Quarter 2014 | $1,588,836.00 | $491,901.03 | $2,080,737.03 |
| 1st Quarter 2015 | $1,795,015.00 | $544,022.51 | $2,339,037.51 |
| 2nd Quarter 2015 | $1,795,015.00 | $526,354.02 | $2,321,369.02 |
| 3rd Quarter 2015 | $1,795,015.00 | $508,824.90 | $2,303,839.90 |
| 4th Quarter 2015 | $1,795,015.00 | $489,651.23 | $2,284,666.23 |
| **Totals**: | $13,535,403.00 | $4,146,680.01 | $17,682,083.01 |

195. Northwestern Mutual already had paid the amounts listed in the "Tax" column in the preceding chart prior to receiving the Form CP220 for each quarter of 2014 and 2015. Upon receipt of the eight notices, Northwestern Mutual paid the amounts listed in the "Interest" column, plus additional daily interest through November 23, 2021 (the date the electronic funds transfer payments settled).

196. Northwestern Mutual's payments of the claimed interest amounts for the 4th Quarters of 2014 and 2015 were reduced by offsetting amounts that had been owed by the IRS and payable to Northwestern Mutual. The "Interest" amounts listed in the chart already reflect these offsetting reductions, such that the total overpayment of interest placed at issue in this Complaint is the $4,146,680.01 figure listed in the chart.

197. On October 10, 2023, Northwestern Mutual timely filed a claim for a refund of the $4,146,680 of interest (submitted in Form 843).

198.    Because Northwestern Mutual is entitled to a refund of all income taxes and FICA taxes paid, it also is entitled to a refund of all interest paid on the 2014 and 2015 assessments, in the amount of $4,146,680.

199.    Even if the Court or trier of fact were to determine that Northwestern Mutual was liable for any portion of the disputed taxes placed at issue in Count I of the Complaint, Northwestern Mutual still would be entitled to a refund of the $4,146,680 in interest, based on the interest-free adjustment provisions of Treasury Regulation § 31.6205-1(b).

200.    On February 6, 2024, the IRS issued a notice erroneously disallowing the refund claim for interest on statute of limitations grounds, attached as **Exhibit H**. Northwestern Mutual incorporates by reference the entire contents of this exhibit in further support of its claims for relief in this action. Although Northwestern Mutual's interest refund claim encompassed tax years 2014 and 2015, the February 6, 2024 notice of disallowance erroneously refers only to tax year 2014, despite denying the entire $4,146,680 in claimed interest.

201.    Northwestern Mutual's claim should have been allowed for each of the reasons alleged in the preceding paragraphs of this Complaint, and the assertion of the statute of limitations by the IRS does not provide a viable basis for denying this claim.

202.    Northwestern Mutual is entitled to a refund of the full $4,146,680 in underpayment interest for 2014-15; alternatively, a refund of the portion of underpayment interest for 2014-15 demanded in the Second Count of the Complaint, in an amount to be determined after a final adjudication of that claim on the merits; and any other or additional relief deemed appropriate by the Court or the trier of fact, to the full extent permitted by law.

## COUNT IV

### Overpayment Interest on Sums Awarded
### Under the First Three Counts of the Complaint

203. Northwestern Mutual realleges and incorporates by reference ¶¶ 1-173 of this Complaint.

204. Pursuant to IRC § 6611, Northwestern Mutual is entitled to an award of overpayment interest on all sums awarded under the first three counts of the Complaint, in an amount to be determined after a final adjudication of those claims on the merits, and any other or additional relief deemed appropriate by the Court or the trier of fact, to the full extent permitted by law.

### REQUEST FOR RELIEF

WHEREFORE, Northwestern Mutual requests that the Court enter an order and final judgment in its favor and against the United States of America, granting the relief requested in the preceding counts of this Complaint, declaring and adjudicating the appropriate scope and contours of the Section 119 exclusion applicable to the value of the subject meals, and awarding Northwestern Mutual its recoverable costs and attorneys' fees, in amount to be determined by the Court after an adjudication of the parties' claims and defenses on the merits.

Dated this 2nd day of September, 2025.

By: */s/ Emma J. Jewell* _____
Paul F. Heaton
State Bar No. 1000858
John Haase
State Bar No. 1027536
Emma J. Jewell
State Bar No. 1104663

Godfrey & Kahn, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone: 414-273-3500
Fax: 414-273-5198
pheaton@gklaw.com
jhaase@gklaw.com
ejewell@gklaw.com

*Attorneys for The Northwestern Mutual Life Insurance Company*

**Index of Exhibits to Complaint**

- **Exhibit A** – Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment (1Q-4Q for 2018 and 2019)

- **Exhibits B.1-B.8** – October 10, 2023 Claims for Refund of $13,535,403 (1Q-4Q for 2014 and 2015)

- **Exhibit C** – October 10, 2023 Claims for Refund of $4,146,680.01 Underpayment Interest (1Q-4Q for 2014 and 2015)

- **Exhibits D.1-D.8** – October 24, 2023 Claims for Refunds of $5,365,011.24 (1Q-4Q for 2018 and 2019)

- **Exhibits E.1-E.8** – Notices of Disallowance of Refund Claims (1Q-4Q for 2014 and 2015)

- **Exhibit F** – Publication 1 (Rev. 9-2017), *Your Rights as a Taxpayer*

- **Exhibits G.1-G.8** – Notices of Disallowance of Refund Claims (1Q-4Q for 2018 and 2019)

- **Exhibit H** – Notice of Disallowance of Refund Claim (Underpayment Interest)

36373592.2